■ In the Matter of 47 AVE. B EAST INC., Petitioner, v NEW YORK STATE LIQUOR AUTHORITY, Respondent. [897 NYS2d 633]—

In this proceeding brought pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, New York County [Nicholas Figueroa, J.], entered on or about June 30, 2009), the petition granted, the determination of respondent, dated October 15, 2008, which canceled petitioner's off-premises liquor license and imposed a $1,000 bond forfeiture, unanimously annulled, on the law, and the underlying administrative complaint dismissed, without costs.

Respondent's finding that petitioner unlawfully transferred alcoholic beverages to another entity did not establish that petitioner sold such beverages, a key element in proving a violation of Alcoholic Beverage Control Law § 100 (1) (*see Matter of Henry St. Liqs. v New York State Liq. Auth.*, 227 AD2d 258 [1996]; *see also Matter of Domin v New York State Liq. Auth.*,

216 AD2d 297 [1995]; *Matter of CVS Discount Liq. v New York State Liq. Auth.*, 207 AD2d 891 [1994]). Contrary to the dissent's contention, the record is bereft of any evidence that petitioner transferred the alcohol for consideration, as required by section 3 (28) of the Alcoholic Beverage Control Law. Concur—Mazzarelli, J.P., Catterson, Freedman and Román, JJ.

Sweeny, J., dissents in a memorandum as follows: I dissent. The issue before the court is whether respondent sustained its burden by the minimal standard of substantial evidence. It clearly did.

Petitioner 47 Ave B East Inc., doing business as Le Souk, and Carthage Palace Inc. (Carthage), doing business as Carne Vale, are both liquor licensees whose establishments are located across the street from each other. Carthage is owned by Marcus Yacob while petitioner is owned by Sameh Yacob, Marcus' brother.

Respondent opened an inquiry after receiving allegations from an undisclosed source that Carthage was improperly obtaining its liquor from an unauthorized entity; specifically, that bottles of liquor were being carried from Le Souk by its employees to Carthage. This source also claimed that Sameh, the sole principal of Le Souk, was running Carthage with his brother Marcus.

As part of that inquiry, on November 14, 2006, Investigators Englander and Cruz went to Charmer Industries, Inc., the exclusive distributor of certain brands of liquor, where they learned that Charmer made four deliveries to Carthage, in the total approximate amount of $2,500. The last delivery occurred on December 3, 2004. As Carthage had not paid its bill, no subsequent deliveries were made by Charmer to Carthage.

The investigators then went to Carthage where they observed, behind the bar counter, eight different brands of liquor totaling 20 one-liter bottles that were distributed exclusively by Charmer. Seven of those bottles had been opened and appeared partially consumed. These bottles were placed on the bar and photographed by the investigators, who then asked an employee of Carthage to speak with the person in charge. One of the employees went across the street and returned with Sameh.

The investigators pointed out the liquor bottles in question and asked Sameh if he had the wholesaler's invoices for them. When Sameh said he would have to ask his brother Marcus for those documents, Investigator Englander told Sameh that he knew no deliveries had been made from Charmer to Carthage since December 2004, and that he suspected the liquor had come from Le Souk. Englander testified at the license revoca-

tion hearing that Sameh "confirmed that that's what had happened, and when I asked him how the bottles had gotten there, he just kind of curtly said, 'they're here.' " Because Englander believed this statement to be an admission, he did not conduct any follow up investigation.

Sameh Yacob testified at the hearing that he was the owner of Le Souk and his brother Marcus was the manager/partner of Carthage. He acknowledged having a conversation with Investigator Englander but claimed he told Englander, "The alcohol is here. I don't know where it came from," and that Marcus had the invoices for the alcohol in question. He denied that he told Englander that the alcohol came from Le Souk and stated Le Souk never gave or sold any alcoholic beverages to Carthage.

When asked if he spoke to Marcus about these charges, Sameh testified that Marcus told him some of the alcohol came from previous owners and some from auctions. No documentation regarding the source of the liquor was produced at the hearing.

The administrative law judge (ALJ) found substantial evidence supporting the charge, finding that "the licensee transferred bottles of liquor from Le Souk to a restaurant owned by his brother and that he admitted this to the investigator." Finding also that Carthage had not had deliveries from Charmer for over two years, the ALJ determined that Sameh's testimony that the bottles were at Carthage from the previous owner was not credible, as the brands in question are "popular" and "would be expected to be rapidly consumed."

Respondent confirmed the ALJ's decision at its October 2, 2008 meeting. It cancelled petitioner's license, effective as of April 14, 2008, the date of a previous cancellation and imposed a $1,000 bond forfeiture.

In reviewing an administrative action, "the court may not substitute its judgment for that of the agency responsible for making the determination, but must ascertain only whether there is a rational basis for the decision or whether it is arbitrary and capricious" (*Flacke v Onondaga Landfill Sys.*, 69 NY2d 355, 363 [1987]). Thus, the court's role is limited to a determination of whether the administrative agency's findings are supported by substantial evidence (*see Matter of 330 Rest. Corp. v State Liq. Auth.*, 26 NY2d 375, 378 [1970]; CPLR 7803 [4]). Unless an administrative agency's determination is irrational or shocks the conscience, it should be upheld (*see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 240 [1974]).

The standard of review we are obligated to follow was suc-

cinctly enunciated in Justice Tom's dissent in *Matter of 47 Ave. B. E. Inc. v New York State Liq. Auth.* (65 AD3d 33, 44-45 [2009], *revd* 13 NY3d 820 [2009]): "[R]eview of an administrative determination is governed by the rather low threshold of substantial evidence, which is less than even a preponderance of the evidence, and may be predicated on both hearsay and circumstantial evidence (*see generally Matter of Café La China Corp. v New York State Liq. Auth.*, 43 AD3d 280, 280-281 [2007]). The findings of an Administrative Law Judge (ALJ) involve the assessment of credibility and the drawing of reasonable inferences, 'and the courts may not weigh the evidence or reject the conclusion of the administrative agency where the evidence is conflicting and room for choice exists' (*id.* at 281)."

Petitioner is alleged to have violated section 100 (1) of the Alcoholic Beverage Control Law, which states in pertinent part: "No person shall . . . sell at wholesale or retail any alcoholic beverage within the state without obtaining the appropriate license." "Sale" is defined by section 3 (28) as "any transfer, exchange or barter in any manner or by any means whatsoever for a consideration, and includes and means all sales made by any person, whether principal, proprietor, agent, servant or employee of any alcoholic beverage and/or a warehouse receipt pertaining thereto. 'To sell' includes to solicit or receive an order for, to keep or expose for sale, and to keep with intent to sell and shall include the delivery of any alcoholic beverage in the state."

Petitioner transferred alcoholic beverages from its establishment to Carthage. A relationship between the two establishments clearly exists. Moreover, it is apparent that the liquor which was transferred from Le Souk to Carthage was for resale, as evidenced by the fact that the bottles were located on the bar and some of the bottles were opened and obviously had been partially consumed. Certainly, since Carthage could not have purchased this liquor from Charmer because of its outstanding bill, there was a transfer for consideration between the two brothers within the definition of Alcoholic Beverage Control Law § 3 (28) and was clearly done to evade the requirements of section 100 (1).

The cases cited by the majority are distinguishable on their facts.

*Matter of Domin v New York State Liq. Auth.* (216 AD2d 297 [1995]) involved alleged violations of Alcoholic Beverage Control Law § 102 (3-b). Rick Tarkin, a supervisor at Charmer Industries asked one of his employees, Sara Einsidler, who had a solicitor's license, to find the best prices for Absolut Vodka and pick up

some cases for delivery to a longtime friend, Dr. Gary Lubov. She purchased three cases from another distributor and placed them in her car. She drove to a liquor store in the vicinity of Lubov's residence where she stopped to call for directions to his home. As he was getting to ready to leave his home, Lubov suggested that the cases be left at that local liquor store and he would pick them up at a later time. Einsidler made arrangements with the liquor store manager to leave the boxes of vodka there. Both were charged with improper sales of alcoholic beverages under Alcoholic Beverage Control Law § 102 (3-b). These charges were sustained by the ALJ.

In overturning the determination, the court found that respondent State Liquor Authority did not establish that there was a sale as defined by statute. Of note, however, is the fact that at no time were the boxes of vodka opened, put on display for sale, or in fact sold to the liquor store in question. The undisputed facts in *Domin* clearly demonstrated that the liquor in question was to be delivered to a private residence for personal use or for gifts and was not purchased for resale.

Nor does *Matter of CVS Discount Liq. v New York State Liq. Auth.* (207 AD2d 891 [1994]) or *Matter of Henry St. Liqs. v New York State Liq. Auth.* (227 AD2d 258 [1996]) support the majority's conclusion.

*CVS* also involved charges brought under Alcoholic Beverage Control Law § 102 (3-b). There, an independent truck driver picked up from a warehouse and delivered to CVS numerous cases of liquor. This liquor had previously been purchased by the manager of CVS from various distributors and stored in its warehouse for delivery to the store as needed. The ALJ found that since CVS had received the liquor from the driver of the delivery truck, who was not licensed to sell such liquor, the "sale" violated the applicable sections of law. In reversing, the court held that the agency's interpretation of the statute was unreasonable, in that "the statute pertains only to the sale of liquor and not to the simple delivery of alcoholic beverages" (207 AD2d at 893). The liquor was purchased by CVS, to be sold by CVS, not a third party. The truck driver had no interest in the resale of the liquor and was not paid based upon that resale. That is clearly not the same situation before us.*

*Henry St.* did involve violations of Alcoholic Beverage Control Law § 100 (1). Petitioner there was a retail liquor store. Investigators observed over 25 cases of liquor being loaded into

---

* *CVS* was also not a substantial evidence question but was reviewed as an error of law (*CVS* at 892).

a van which made various stops, where some cases were unloaded on each stop. The investigators did not see the contents of the boxes and never contacted the persons to whom those deliveries were made. At the hearing, petitioner testified that he operated a high-volume discount store and did a lot of business with commercial establishments. The owners of some of the establishments testified at the hearing, supported in some cases with invoices and cancelled checks, that they purchased the liquor in question to give as holiday gifts or for personal consumption, not for resale.

Subsequently, these same investigators noted a series of other deliveries to various bars from Henry Street via private vehicles. However, in each instance, the investigators were told that no one at Henry Street knew the purchases were made for resale at those bars. In fact, some of the bar owners did not know their employees had purchased the liquor from Henry Street and not from a distributor as required by law.

The ALJ sustained all the charges. In reversing the determination of respondent liquor authority that petitioner had violated Alcoholic Beverage Control Law § 100 (1), we noted that the ALJ made no analysis of the evidence presented at the hearing. We found that "[s]ales by a discount liquor store in case or multi-case lots are by no means unusual. The destination of 10 cases of alcoholic beverage . . . is insufficient evidence of petitioner's involvement in an illegal scheme to sell its merchandise at wholesale" (227 AD2d at 260).

These facts are clearly distinguishable from those before us. Once again, the cases of alcohol in *Henry St.* had not been opened. Even where the purchases were made for resale, as in the situations where the ultimate delivery of the liquor was a bar, there was no proof whatsoever that the proprietor of Henry Street knew that to be the case.

In our case, the evidence showed that the liquor was transported to Carthage *from* Le Souk *by employees of* Le Souk. Petitioner clearly knew that the liquor was going to be used for resale. Further, unlike *Domin, CVS* and *Henry St.*, there was a mutually supportive business relationship between the two establishments here (owned by brothers), so much so that when the investigators asked to speak to the person in charge of Carthage, the employee went across the street to get Sameh.

Regarding the penalty, our function in reviewing an administratively-imposed sanction is limited to reviewing whether the penalty is so disproportionate to the offense, in light of all the circumstances, as to be irrational or an abuse of discretion (*Pell* at 240). Petitioner has a lengthy history of

sustained violations, including two prior violations related to overcrowding and three violations for disorderly premises. Penalties included (1) $12,000 and a 10-day suspension which was upheld after an article 78 proceeding; (2) $12,500 and a seven-day license suspension also upheld after an article 78 proceeding; and (3) a penalty of cancellation upheld by the Court of Appeals (*Matter of 47 Ave. B. E. Inc. v New York State Liq. Auth.*, 13 NY3d 820 [2009]). While severe, in light of all the circumstances, the penalty is not excessive (*see Matter of Monessar v New York State Liq. Auth.*, 266 AD2d 123 [1999]).

I would therefore dismiss the petition and confirm the determination.